## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | **Criminal No. 17-00045-KD** |
| | * | |
| JESSICA MICHELLE POLK | * | |

## PLEA AGREEMENT

The abovecaptioned defendant, represented by her counsel, and the United States of America have reached a plea agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

### RIGHTS OF THE DEFENDANT

1.    The defendant understands her rights as follows:

    a.    To be represented by an attorney;

    b.    To plead not guilty;

    c.    To have a trial by an impartial jury;

    d.    To confront and cross-examine witnesses and to call witnesses and produce other evidence in her defense; and

    e.    To not be compelled to incriminate herself.

### WAIVER OF RIGHTS AND PLEA OF GUILTY

2.    The defendant waives rights b. through e., listed above, and pleads guilty to Count 1 of the Indictment, charging a violation of Title 21, United States Code, Section 846, conspiracy to possess with intent to distribute methamphetamine.

3.    The defendant understands that the statements she makes under oath in the plea of guilty must be completely truthful and that she can be prosecuted for making false

1

statements or perjury, or receive a perjury enhancement at sentencing, for any false statements she makes intentionally in this plea of guilty.

4.  The defendant expects the Court to rely upon her statements here and her response to any questions that she may be asked during the guilty plea hearing.

5.  The defendant is not under the influence of alcohol, drugs, or narcotics. She is certain that she is in full possession of her senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing which will follow.

6.  The defendant has had the benefit of legal counsel in negotiating this Plea Agreement. She has discussed the facts of the case with her attorney, and her attorney has explained to the defendant the essential legal elements of the criminal charge which has been brought against her. The defendant's attorney has also explained to the defendant his understanding of the United States' evidence and the law as it relates to the facts of her offense.

7.  The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charge beyond a reasonable doubt. The defendant and her counsel have discussed possible defenses to the charge. The defendant believes that her attorney has represented her faithfully, skillfully, and diligently, and she is completely satisfied with the legal advice of her attorney.

8.  A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing. The Factual Resume is incorporated by reference into this Plea Agreement. The defendant and the United States agree that the Factual Resume is true and correct. Alterations to the Plea Agreement or Factual Resume initialed only by the defendant and her counsel are not part of

2

this agreement and are not agreed to by the United States.

9.    This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement.   There have been no promises from anyone as to the particular sentence that the Court will impose.   The defendant is pleading guilty because she is guilty.

10.    The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter.   This waiver includes, but is not limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

## PENALTY

11.    The maximum penalty the Court could impose as to Count 1 of the Indictment is:

   a.    10 years to life imprisonment;

   b.    A fine not to exceed $10,000,000;

   c.    A term of supervised release of 5 years, which would follow any term of imprisonment.   If the defendant violates the conditions of supervised release, she could be imprisoned for the entire term of supervised release;

   d.    A mandatory special assessment of $100;

   e.    Forfeiture of property.

## SENTENCING

12.    The Court will impose the sentence in this case.   The United States Sentencing

3

Guidelines are advisory and do not bind the Court. The defendant has reviewed the application of the Guidelines with her attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation. The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance with the Guidelines. The defendant understands that she will not be allowed to withdraw her guilty plea if the advisory guideline range is higher than expected, or if the Court departs or varies from the advisory guideline range.

13.     The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

14.     The United States will provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation. Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

15.     Both the defendant and the United States are free to allocute fully at the time of sentencing.

16.     The defendant agrees to tender $100 to the United States District Court Clerk in satisfaction of the mandatory special assessment in this case. The United States reserves the right to withdraw any favorable recommendations it may agree to

4

within this document if the defendant fails to pay the special assessment prior to or at the time of her sentencing.

## FORFEITURE

17.    The defendant agrees to confess the forfeiture to the United States of all properties which represent proceeds of her criminal activities or which facilitated any aspect of these illegal activities, in accordance with the forfeiture allegation in the Indictment.

## FINANCIAL OBLIGATIONS

18.    The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.    In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

## UNITED STATES' OBLIGATIONS

19.    The United States will not bring any additional charges against the defendant related to the facts underlying the Indictment and will move to dismiss all remaining counts once sentence is imposed.    This agreement is limited to the United States Attorney's Office for the Southern District of Alabama and does not bind any other federal, state, or local prosecuting authorities.

20.    The United States will recommend to the Court that the defendant be sentenced at the low end of the advisory sentencing guideline range as determined by the

Court.

## APPLICATION OF U.S.S.G. § 5K1.1 AND/OR FED.R.CRIM.P. 35

21.     The defendant understands and agrees that she has no right to cooperate, and that

the decision whether to allow her to cooperate is reserved solely to the United

States in the exercise of its discretion.   If the United States agrees to allow the

defendant to cooperate, and if the defendant agrees to cooperate, the following

terms and conditions apply:

   a.     The defendant shall fully, completely, and truthfully respond to all

   questions put to her by law enforcement authorities regarding the

   underlying facts of the offense(s) with which she is charged, as well as the

   underlying facts of any criminal offense(s), state or federal, of which she

   has information or knowledge.

   b.     The defendant acknowledges that she understands that she shall provide

   truthful and complete information regarding any offense about which she

   has knowledge or information regardless of whether law enforcement

   authorities question her specifically about any such offense.   This

   provision requires the defendant to divulge all information available to her

   even when law enforcement authorities do not know about the defendant's

   involvement, knowledge or information relating to any particular offense.

   This requirement extends to any and all persons about whom the

   defendant has such knowledge or information.

   c.     The defendant agrees to cooperate completely with all law enforcement

   authorities in any matters to which her cooperation may be deemed

6

relevant by any law enforcement authority. The defendant agrees to fully comply with all instructions from law enforcement authorities regarding the specific assistance she shall provide. This includes, but is not limited to, consenting to monitored and/or recorded telephone conversations, participating in undercover operations, testifying completely and truthfully before any grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

d.      If the United States deems it necessary, the defendant may be required to take a polygraph examination(s) which will be administered by a government polygrapher. The defendant agrees that the results of any polygraph examination may be used by the United States in its evaluation of whether there has been substantial assistance, and are admissible at sentencing to rebut an assertion by the defendant of bad faith or unconstitutional motive on the part of the United States.

e.      The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in her possession or under her control and which are relevant to her participation in and knowledge of criminal activities, regardless of whether it relates to the charged offense. This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

f.      The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the

7

illegal activities of another.

g.    If the defendant provides full, complete, truthful and substantial

cooperation to the United States, which results in substantial assistance to

the United States in the investigation or prosecution of another criminal

offense, a decision specifically reserved by the United States in the

exercise of its sole discretion, then the United States agrees to move for a

downward departure in accordance with Section 5K1.1 of the United

States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal

Procedure, whichever the United States deems applicable.  The United

States specifically reserves the right to make the decision relating to the

extent of any such departure request made under this agreement based

upon its evaluation of the nature and extent of the defendant's cooperation.

The defendant understands that the United States will make no

representation or promise with regard to the exact amount of reduction, if

any, the United States might make in the event that it determines that the

defendant has provided substantial assistance. The defendant understands

that a mere interview with law enforcement authorities does not constitute

substantial assistance.  The defendant also understands that, should she

provide untruthful information to the United States at any time, or fail to

disclose material facts to the United States at any time, or commits a new

criminal offense, the United States will not make a motion for downward

departure.  If the defendant's effort to cooperate with the United States

does not amount to substantial assistance as determined solely by the

8

United States, the United States agrees to recommend that the defendant receive a sentence at the low end of the advisory guideline range.

h.    The United States and the defendant agree that any breach of this agreement by the defendant, including but not limited to committing a new offense, failing to cooperate, intentionally withholding information, giving false information, committing perjury, failing to identify assets obtained by her from her illegal activities or obtained by others associated with her or of which she has knowledge, refusing to take a polygraph examination, failing a polygraph examination, or refusing to testify before the grand jury or at any judicial proceeding, would:

(1)    permit the United States to reinstate and proceed with prosecution on any other charges arising from the matters underlying the Superseding Indictment; and

(2)    permit the United States to initiate and proceed with the prosecution on any other charges arising from a breach of this agreement.   The United States will not be limited, in any respect, in the use it may make against the defendant of any information provided by the defendant during her breached cooperation.   Such breach will constitute a waiver of any claim the defendant could make under the United States Constitution, the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, or any statute or case law by which the defendant seeks to suppress the use of such information or any evidence derived from such information.

9

i.  Nothing in this agreement shall protect the defendant in any way from prosecution for any offense committed after the date of this agreement, including perjury, false declaration, false statement, and obstruction of justice, should the defendant commit any of these offenses during her cooperation.  The defendant acknowledges and agrees that the information that she discloses to the United States pursuant to this agreement may be used against her in any such prosecution.

j.  The United States and the defendant agree that the defendant will continue her cooperation even after she is sentenced in the instant matter.  her failure to continue her cooperation will constitute a breach of this agreement, and the defendant agrees that under such conditions, the United States will be free to reinstate the charges and the prosecution of the charges in the Superseding Indictment, which are to be dismissed in accordance with this agreement.  Under these circumstances, the defendant expressly waives any rights she may have under the statute of limitations and the speedy trial provisions.

## LIMITED WAIVER OF RIGHT TO APPEAL AND WAIVER OF COLLATERAL ATTACK

22.  As part of the bargained-for exchange represented in this plea agreement, and subject to the limited exceptions below, the defendant knowingly and voluntarily waives the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. Accordingly, the defendant will not challenge her guilty plea, conviction, or

sentence (including a sentence imposed on revocation of probation or supervised release) in any district court or appellate court proceedings.

a.   **EXCEPTIONS.**   The defendant reserves the right to timely file a direct appeal challenging:

(1)   any sentence imposed in excess of the statutory maximum;

(2)   any sentence which constitutes an upward departure or variance from the advisory guideline range.

In addition, the defendant further reserves the right to claim ineffective assistance of counsel in a direct appeal or a petition filed pursuant to Title 28, United States Code, Section 2255.

23.   If the United States files a notice of appeal and such appeal is authorized by the Solicitor General, the defendant is released from the appellate waiver.

24.   The defendant further reserves the right to timely move the district court for an amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the sentence.

25.   If the defendant receives a sentence within or below the advisory guideline range, this plea agreement shall serve as the defendant's express directive to defense counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by the defendant.

## VIOLATION OF AGREEMENT

26.   The defendant understands that if she breaches any provision of this Plea Agreement, the United States will be free from any obligations imposed by this agreement, but all provisions of the agreement remain enforceable against the

11

defendant.   In the exercise of its discretion, the United States will be free to prosecute the defendant on any charges of which it has knowledge.   In such event, the defendant agrees not to assert any objections to prosecution that she might have under the Sixth Amendment and/or Speedy Trial Act.

27.    In addition, if the defendant is released from detention prior to sentencing, she understands that the United States will no longer be bound by this agreement if she violates any condition of her release prior to sentencing or prior to serving her sentence after it is imposed.

### ENTIRETY OF AGREEMENT

28.    This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY

Date: 4/13/17

Vicki M. Davis, Criminal Chief
Assistant United States Attorney

Date: 4/24/17

Gloria A. Bedwell
Assistant United States Attorney

I have consulted with my counsel and fully understand all my rights with respect to the offense charged in the Indictment pending against me.   I have read this Plea Agreement and carefully reviewed every part of it with my attorney.   I understand this agreement, and I voluntarily agree to it.   I hereby stipulate that the Factual Resume, incorporated herein, is true

12

and accurate in every respect, and that had the matter proceeded to trial, the United States could

have proved the same beyond a reasonable doubt.

Date: 04/24/17          _____
                        Jessica Michelle Polk

I am the attorney for the defendant. I have fully explained her rights to her with respect

to the offense(s) charged in the Indictment in this matter.   I have carefully reviewed every part

of this Plea Agreement with her.   To my knowledge, her decision to enter into this agreement is

an informed and voluntary one.   I have carefully reviewed the Factual Resume, incorporated

herein, with the defendant and to my knowledge, her decision to stipulate to the facts is an

informed, intelligent and voluntary one.

Date: 4/24/17          _____
                        Christ N. Coumanis, Esq.
                        Defense Counsel

13

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

UNITED STATES OF AMERICA     *
                                 *

v.                               *        Criminal No. 17-00045-KD

                                  *

JESSICA MICHELLE POLK       *

## FACTUAL RESUME

The abovecaptioned defendant admits the allegations of Count 1 of the Indictment.

## ELEMENTS OF THE OFFENSE

**Count One**:  The defendant understands that in order to prove a violation of Title 21, United States Code, Section 846, conspiracy to possess with intent to distribute methamphetamine, the United States must prove the following beyond a reasonable doubt:

First, that two or more individuals came to a mutual understanding to commit an unlawful act, in this case, the possession with intent to distribute controlled substance; and second, that the defendant, knowing of the unlawful purpose of the plan, knowingly and intentionally joined in the plan.   The government must also prove that the offense involved more than 50 grams of methamphetamine.

## OFFENSE CONDUCT

The defendant admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case.   This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for her plea of guilty.   The statement of facts does not contain each and every fact known to the defendant and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

**Facts**

1

During 2016, the Baldwin County sheriff's office and the FBI task force received information from a cooperating defendant which implicated several subjects in Baldwin County. On July 27, 2016, Jason Charles Diard was identified following a knock and talk conducted at a hotel room in Foley.   Meth ice was seized from his room.   In a post-Miranda interview, Diard admitted that the drugs and paraphernalia were his.   Diard was advised of his constitutional rights and he stated that he had been getting meth ice in quantities of 1 to 3 ounces every day for six months from Cameron Michanowicz.   He had seen approximately 20 ounces at Michanowicz's house on Japonica Avenue in Pensacola regularly.   He knew Michanowicz had guns, because he saw them at his house and his business.   Diard admitted that the drugs seized from him had been supplied by Michanowicz the day before the drugs were seized at the hotel. He stated that Michanowicz also had heroin and acid at his house and business.   Diard was aware the Michanowicz was supplying three other subject in Baldwin County.   Diard agreed to cooperate with the agents.   He contacted Michanowicz and arranged to purchase 2.3 ounces of meth ice from him later that day.   Diard was equipped with electronic devices to record the contact, and he traveled to Pensacola to meet Michanowicz at his residence.   He provided cash for the drugs, and left the house to meet the agents at a predetermined location.   They recovered the drugs and the equipment from him.   The drugs tested positive for meth ice at the FBI laboratory.

In another incident involving Diard, on August 29, 2016, management at a different hotel in Foley notified the Foley police that one of their housekeepers has discovered what appeared to be drugs and paraphernalia in room 204 when she entered to clean it.   Hotel management notified the person who leased and occupied the room, Jason Diard and C.H., that they had found

2

drugs in the room and that the police were coming.   Diard and C.H. left before the police

arrived.   Officers applied for and received a search warrant for the room, and they entered to

execute the warrant.   The officers seized marijuana, methamphetamine, drug paraphernalia and

a notebook containing "drug notes," that is, notations reflecting a list of customers, drug amounts

and money.

The agents located Diard and confronted him about the drugs recovered in the hotel

room.   At that time, Diard gave information on another subject, who was a supplier for

Michanowicz and Jeffery Baisch, also of Pensacola.   In that controlled buy, which took place on

the same day, August 29, 2016, Diard again contacted his supplier to arrange the deal.   He   was

again equipped with electronic devices to record the deal, and was given cash to use to buy the

drugs.   During the meeting with the supplier, the audio recording picked up the conversation,

but the camera was directed away from the supplier.   Accordingly, neither the supplier nor the

drug deal was captured on video.

Diard and the supplier also discussed the amount of money owed to the supplier.   The

supplier is heard talking about providing some "balls," a reference to 8-balls, or an eighth of an

ounce of drugs.   The supplier and Diard also discuss "Josh's" drug debt and Diard's drug debt.

They agree that they were "even" this morning, and both agree that Diard paid $900 the previous

night.   The money for the drugs being purchased is counted and they continued to discuss the

debt and the payment.   They eventually agree that they are squared away.   Diard was

confronted by the agents about this transaction, and he admitted the he stole a portion of the

drugs from what was supplied by the target.

Michanowicz was identified by other local distributors as a meth ice supplier for Baldwin

3

County and the surrounding area.   Cooperating Defendant 1 (CD1) identified Donnie Thomas as a subject who used, sold and traded drugs regularly.   Donnie Thomas specifically received a quarter-ounce of meth ice every two days during a three- to four-month period during 2015. CD1 also identified Cameron Michanowicz as a subject who lived on Japonica Street in Pensacola.   CD1 had been to Michanowicz's residence with another subject and they saw 15 to 20 ounces of meth there.   CD1 bought a half-ounce from him for $450, and subsequently returned to purchase another .75-ounce for $700.

Jessica Polk was arrested on drug charges and she gave a couple of post-Miranda statements to investigators.   She told investigators that she met Michanowicz in November of 2015, and he/she began to deal with Michanowicz from that time through February of 2016. She was arrested near the beginning of March but was out for a little more than a week at the first of June in 2016.   During that week, she resumed dealings with Michanowicz, and usually purchased 1 to 4 ounces of meth ice at a time, at least two to three times per week.   She stated that Michanowicz used his business to stash drugs and guns.   She stated that Michanowicz concealed drugs in paint cans at the business.   She had seen Michanowicz in possession of 4 kilograms of meth ice on occasion, and up to a pound of heroin at his business location.   She had also seen up to one kilogram of meth ice and about an ounce of heroin at his residence once during 2016.   She stated that Michanowicz would take guns in trade for drugs and that he/she had seen guns at his residence.

She identified Jeff Baisch as Michanowicz's right-hand man.   She stated that he/she has seen Baisch in possession of a pound of meth ice and an ounce of heroin at his residence.   She also stated that Baisch had pistols and long guns, in spite of the fact that he was a convicted

4

felon.   She agreed to make trips for a source of supply in Georgia to pick up drugs and deliver

them as needed.   She admitted to making deliveries of 4 to 10 kilograms of meth ice every

week or every two weeks for about two years.   On one such trip, she transported 16 kilograms.

She delivered ounces of meth ice to two subjects in Baldwin County four or five times.

Polk provided another post-Miranda statement following a subsequent arrest.   In that

statement, she admitted introducing Michanowicz to the supplier from Georgia.   She stated that

Michanowicz purchased a kilogram from his as a result.   Michanowicz sold the kilogram in a

day, and requested additional drugs.   She told investigators that he/she and the supplier made

three trips to Georgia and back in three days to get a kilogram of meth ice for Michanowicz on

each trip.   After the first trip, Polk stated that Michanowicz supplied Baisch with .5 to one

pound of meth ice.

CD3 told investigators that he/she was dealing with a supplier for meth ice and that

he/she met Michanowicz in about the middle of 2015 in Baldwin County at his/her residence.

Within a week of their meeting, CD3 had arranged to provide Michanowicz with quarter-ounces

of meth ice.   The amounts increased over two or three months through 2016.   CD3 fled

Baldwin County to avoid arrest and was no longer in a position to supply meth ice in substantial

quantities.   CD3 subsequently observed large amounts of meth ice at Michanowicz's shed.

CD3 then began to get meth ice from Michanowicz, approximately 1 to 3 ounces at a time every

other day for 3 months.   CD3 gradually introduced his distributors to Michanowicz to back out

of the business.

CD3 also met Baisch through his original supplier.   CD3 supplied Baisch with 1 to 2

ounces on two or three occasions.   CD3 stated that Baisch believed he/she was charging too

much.   Baisch was also getting meth ice from CD3's original supplier, and became one of that supplier's main distributors.   After that supplier finally got locked up, Baisch told CD 3 that he was getting meth ice from Michanowicz.   CD3 had seen Baisch in possession of two pistols at his house.

On November 9, 2016, the Baldwin County Drug Task Force executed a search warrant on North Hickory Street in Foley, at premises known as B & R Tires.   As officers approached to execute the search warrant, they observed Thomas enter a small utility shed on the east side of the property.   Investigators heard screaming coming from the office building and they elected to enter it first.   They found Klifton Adam Bond and his wife upon entry into the building.   As Bond was ordered to the floor by the officers, Bond slid a sunglasses case across the floor.   It was found to contain approximately 12 grams of meth ice.   Deputies found another bag of methamphetamine in Bond's wallet.   He had $729 in cash and a set of digital scales containing residue on his person. In the desk drawer in front of his wife, the officers found a meth pipe and three prescription bottles in her name.   One of the bottles contained no pills, but methamphetamine ice was inside.   There were also six Suboxone packages in her purse along with $2,000 in cash.   When Bond's wife was booked into the jail on state possession charges, the jailers found approximately a gram of meth ice concealed in her bra.

Another deputy approached the shed and observed Thomas near the entrance.   Thomas turned to run, and the deputy observed Thomas throw money to the side of the shed and discard a handgun from his pants leg as he appeared to consider running.   Thomas apparently changed his mind and decided to get to the ground.   Deputies recovered the gun, approximately $145 in cash, a hypodermic syringe containing fluid, and approximately 1 gram of meth ice from the area

near Thomas. In the shed, deputies found approximately 27 grams of meth ice in a file cabinet drawer. There was a line of meth ice laid out on the desk, a digital scale, small plastic baggies used to package meth, $53 in cash and a marijuana cigarette.

The deputies advised all the subjects of their rights. Thomas stated at the scene that he was under the influence of methamphetamine and he frequently used methamphetamine. He said he used the shed where the 27 grams of meth were found as an office. He said he had slept in the shed for the past two nights because he was homeless. He said the meth in the shed belonged to Bond. He said he saw Bond bring the meth into the shed and he was aware that it was there. Thomas stated that the gun was his and he got it from a guy three days earlier. He would not identify the person from whom he got the gun.

Deputies interviewed Bond. He said he used meth daily and was addicted to it. He said he did not sell meth, but Donnie Thomas did sell it. He said all the meth found on the premises belonged to Thomas, except for what was in his wallet and what was in his wife's purse. He said the meth in his wallet and in his wife's purse belonged to him. He said he put the meth in her purse. He said he got his meth from Thomas, and Thomas had a source of supply for meth in Pensacola, Jeff Baisch. Bond stated that Thomas and two women bought meth from Baisch in Pensacola twice. He did not know the total amount of meth purchased. He stated that he gave Thomas $750 to purchase one ounce of meth from him, and Thomas returned and gave him the ounce. Bond stated he did not like it, so he gave it back to Thomas. He said Thomas was going to sell it for him and give him the $750 back. Bond stated that Thomas got meth from Baisch about twice a week. He thought Baisch had about 96 ounces of meth at the time of the interview. Bond stated that since he returned the ounce to Thomas, all the meth on

7

the premises belonged to Thomas.  Bond stated that the only exception was the gram in his

wallet and the meth in his wife's possession.  He said the meth in her purse was also his.

During this interview, Bond denied possession of the meth in the sunglasses case,

notwithstanding his earlier admission about it.

Bond stated that he personally had bought meth from Baisch twice.  The last time was

the previous Thursday or Friday prior to the search.  He said he drove to Baisch's residence in

Pensacola.  He said while he was there, a black male, small in stature, about 30 to 40 years old,

arrived at Baisch's residence in a white Ford Crown Victoria.  He said the black male came

inside the house and provided Baisch with an unknown amount of meth.  He said Baisch sold

him one ounce of the meth for $750.  Bond stated the first time he bought meth from Baisch was

about a month ago.  He stated that he picked Baisch up from his residence in Pensacola and

drove him directly to the residence of his source of supply, which was an address on Gail Drive

in Pensacola.  Bond stated that this was the same black male who he met during the most recent

encounter and he believed it was the source's residence.

Bond was arrested again on or about December 20, 2016, when he was stopped by Gulf

Shores police officers.  He was found in possession of a pistol and a rifle at that time.  Bond

had been previously convicted of felony assault in Baldwin County.  The guns, which are

described in the indictment, were not manufactured in the state of Alabama; therefore, the

defendant's possession of them affected interstate commerce.

Thomas was interviewed on two subsequent occasions.  On August 9, 2016, Thomas

was advised of his Miranda rights by investigators participating in the investigation.  He agreed

to waive his rights to be interviewed.  Thomas identified a female meth ice dealer in Foley and

stated that her suppliers were Cam Michanowicz and Jeff Baisch, and that the female usually gets between three to five ounce of meth from them.   He said Michanowicz and Baisch are in business together.   Thomas stated that he was with another female on two occasions when she purchased meth ice from Baisch in quantities of 1.5 ounces one time and 3 ounces the other time. Thomas stated that he had been with a third female twice when she purchased meth ice from Baisch and his roommate.   Thomas was not sure of the amounts of meth ice she bought on those occasions.

On August 23, 2016, federal agents met with Thomas to obtain additional information. In a post-Miranda statement, Thomas stated that he met Jeff Baisch about three months ago through one of the women he mentioned in his previous statement.   He said Baisch would deliver meth ice in Baldwin County and he had also meth Baisch in Perdido Key, Florida, to pick up drugs from him.   On or about August 1, 2016, Thomas met Baisch at a service station in Perdido Key, Florida, to purchase one ounce of meth from Baisch for $850.   On or about August 5, 2016, Thomas met Baisch at the same location in Perdido Key, Florida to get an ounce of meth for $850.

Agents and officers used a cooperating informant to make a controlled buy of meth ice from Biasch on or about August 10, 2016.   Agents established surveillance at the service station on Perdido Key Drive in Perdido Key, Florida, and the informant, who was equipped with electronic device to record the transaction, met Biasch and obtained the drugs in exchange for cash.   The informant met the agents at a prearranged location and they retrieved the equipment and the drugs, approximately 26.1 grams of meth ice.

On August 11, 2016, the agents and officers executed search warrants at several

9

locations, including Michanowicz's and Baisch's residences in Pensacola.  At Michanowicz's

residence, they seized five firearms, ammunition, handwritten notes, drugs, scales, drug

paraphernalia, documents, cell phones, three computers and approximately $850 in cash.

Michanowicz was advised of his rights and he agreed to waive his rights a make a statement.

Michanowicz told the agents, among other things, that he was not a "big guy" in the drug

business.  He stated that he sold three to five ounce of meth ice per week for six months.  He

subsequently said this amount was 1 to 2 ounces per week.  However, when discussing the

amount of meth ice he sold to Jeff Baisch, he stated he provide him with one to two ounce of

meth ice per week for 3 months.  He also stated the Baisch bought drugs from him just as much

as Baisch bought from Michanowicz.  The deals with Baisch occurred at his residence on

Japonica Avenue, his business on West Navy Boulevard or at Baisch's residence.

Michanowicz identified one supplier from whom he stated he had purchased 8 to 10 ounce of

meth ice on one occasion.

On the same date, a search warrant was executed on Biasch's residence on Canal Road in

Pensacola.  Biasch was present as were several other subjects.  One of the others was in

possession of .380 caliber pistol.  Three other guns were recovered from the residence, along

with methamphetamine ice, a digital scale, ammunition, magazines for an AR-15, camo body

armor, a digital scale, four phones, and a laptop computer.  Baisch was advised of his rights and

he agreed to make a statement.  He said he had been dealing meth for about 18 months.  He

said he had been supplied by that person for a long time, and he had gotten 8 ounces of meth

from her once a week for more than a year.  He paid her $1,000 per ounce.  Baisch said he had

known Michanowicz for 3 or 4 months.

During his introduction to Michanowicz, Baisch saw him in possession of a kilogram of meth ice. Baisch bought an ounce of it for $900. About two weeks later, Baisch bought more meth ice from Michanowicz. Baisch identified one of his distributors who also got meth ice from Michanowicz. According to Baisch, that subject moved about 10 ounces a day for Michanowicz. Over the course of three to four months, Baisch purchased meth from Michanowicz about 10 times, 1 to 2 ounces at a time. Biasch had seen Michanowicz in possession of multiple kilograms of meth ice, both at his residence and at his business. Baisch also identified another supplier who made trips to this area from Georgia every two days for the last two weeks, bringing 2 kilograms of meth ice each trip. This subject was the same supplier identified by Diard in August and from whom Diard made a controlled buy of approximately two ounces at that time. Baisch stated that the previous week, this supplier made the trip two days in a row, bringing back 2 kilograms each time. Baisch knew that this subject had been formerly dealing with Michanowicz. Baisch believed that Michanowicz was not happy with him because he was dealing directly with the supplier, thereby cutting Michanowicz out and competing with Michanowicz for drug sales at lower prices. Baisch admitted he bought two ounces three to four times from that supplier. Baisch identified several distributors who got meth ice from him and sold it Alabama. Baisch admitted that he had traded drugs for one of the guns in the house.

The parties agree that Polk is accountable for approximately 192 kilograms of methamphetamine ice as relevant conduct, and that the Government can prove that amount beyond a reasonable doubt.

AGREED TO AND SIGNED.

11

Respectfully submitted,

STEVE BUTLER
ACTING UNITED STATES ATTORNEY

Date: 4/14/17

Vicki M. Davis, Criminal Chief
Assistant United States Attorney

Date: 4/14/17

Gloria A. Bedwell
Assistant United States Attorney

Date: 4/24/17

Jessica Michelle Polk
Defendant

Date: 4/24/17

Christ N. Coumanis, Esq.
Attorney for Defendant

12